# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-0277V
UNPUBLISHED

| | |
|---|---|
| RENEE LACOURSE-BURMEISTER,<br><br>　　　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: February 16, 2022<br><br>Special Processing Unit (SPU);<br>Ruling on Entitlement; Findings of<br>Fact; Severity; Onset; Influenza (Flu);<br>Shoulder Injury Related to Vaccine<br>Administration (SIRVA). |

*Leigh Finfer*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Debra A. Filteau Begley*, U.S. Department of Justice, Washington, DC, for Respondent.

## RULING ON ENTITLEMENT[1]

On March 12, 2020, Renee LaCourse-Burmeister filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that as a result of an influenza ("flu") vaccine received on September 25, 2018, she suffered a shoulder injury related to vaccine administration ("SIRVA") as defined on the Vaccine Injury Table (the "Table"). Petition (ECF No. 1) at Preamble. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons discussed below, I find it most likely that Petitioner suffered the residual effects of her alleged SIRVA for more than six months, that she suffered the onset of symptoms within 48 hours, and that she is otherwise entitled to compensation.

## I. Relevant Procedural History

Petitioner filed supporting documentation required by the Vaccine Act, followed by a statement of completion in September 2020. ECF No. 20. In light of the volume of cases awaiting HHS medical review, on October 21, 2020, Respondent duly provided a preliminary review of the case in lieu of a Rule 4(c) Report, which identified only one substantive issue: that the evidence did not appear to demonstrate six months of residual effects. ECF No. 21.[3] Later, on June 28, 2021, Respondent more formally opposed compensation for Petitioner's Table SIRVA claim, contending that Petitioner had not established the six-month requirement or, moreover, the onset of pain within 48 hours after vaccination. Rule 4(c) Report (ECF No. 30).

On August 16, 2021, I directed the parties to file any additional evidence and briefing pertaining to the above issues, which would then be ripe for adjudication without need for a hearing. ECF No. 32. On October 12, 2021, Petitioner filed a Motion for a Ruling on the Record (ECF No. 33). On November 19, 2021, Respondent filed his Response (ECF No. 35). Petitioner did not file a reply.

## II. Issues

As noted above, the first issue is whether Petitioner has established that her alleged SIRVA was sufficiently severe to be eligible for compensation under the Vaccine Act. Petitioner specifically has the burden of establishing that she suffered "residual effects" of that injury for more than six months. Section 11(c)(1)(D)(i).[4] The second is whether Petitioner's first symptom or manifestation of onset after vaccine administration (specifically pain in the affected shoulder) occurred within 48 hours after vaccination, as set forth in the Vaccine Injury Table and Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA. 42 C.F.R. §§ 100.3(a)(XIV)(B); (c)(10)(ii).

---

[3] Respondent also requested several categories of potentially outstanding evidence. ECF No. 21. Petitioner's responsive filings (Exhibits 9-11) did not appear to change Respondent's position nor do I find them to be relevant to the issues disputed herein.

[4] Petitioner does not allege, nor would the evidence support, either alternative for establishing the severity requirement: that the alleged injury resulted in death, or "inpatient hospitalization and surgical intervention." Section 11(c)(1)(D)(ii), (iii).

### III.     Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined.

*Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## IV.     Findings of Fact

I have fully reviewed the evidence, including all medical records, Petitioner's affidavit, Respondent's Rule 4(c) Report, and the parties' briefing. The evidence most relevant to my analysis is presented below:

- At the relevant time, Ms. LaCourse-Burmeister was fifty-two (52) years old and had a non-contributory medical history. *See generally* Ex. 2.

- She was employed as a purchasing agent for Belmark, Inc., and separately as a real estate agent. *See* Ex. 2 at 17, 37, 60; Ex. 4 at 37.

- On August 7, 2018, Petitioner met with a nurse onsite at Belmark, Inc., to start a ten-week "Eat Right for Life" program focused on weight management and wellness. Ex. 3 at 45. After reviewing the program format and providing instructional materials, the nurse instructed Petitioner to return within the next five weeks "for health coaching specific to nutrition." *Id.* at 45.

- On September 25, 2018, during Petitioner's annual employee health risk assessment ("HRA"), a second nurse administered the flu vaccine to her left deltoid. Ex. 1 at 1; Ex. 6 at ¶ 4.

- Seven (7) days post-vaccination, on October 2, 2018, Petitioner met with a third nurse for her Eat Right for Life mid-program check-in. Ex. 3 at 46. Petitioner reported that she had done well so far by cutting portions; balancing her consumption of carbohydrates, protein, and fat; and avoiding processed foods. *Id.* She had been a runner until undergoing surgeries on her hip, back, and jaw in 2015 and 2016. *Id.* Petitioner reported currently walking for exercise; she did not engage in high impact exercise due to her back. *Id.* The nurse encouraged Petitioner to continue with good food choices, portion control, and regular exercise. *Id.* at 47. This record does not include a review of systems, physical exam, or any references to her left shoulder.

- Twenty-four (24) days post-vaccination, on October 29, 2018, Petitioner presented to her primary care provider at Bellin Health for evaluation of two separate issues: (1) right elbow pain, which was assessed as ulnar nerve entrapment,[5] and (more central to the present claim) (2) left shoulder and arm pain which "started on 09/25/2018 after receiving influenza injectio[n]" which, Petitioner believed, was "given higher than other injections… pushed right into her shoulder joint." Ex. 3 at 48. The pain "ha[d] only increased," and was worse "with lying on the shoulder and any activity even walking." *Id.*

- On physical examination, Petitioner had tenderness on palpation of the acromioclavicular ("AC") joint and subacromial bursa. Ex. 3 at 49. She had pain with movement and abnormal findings on several tests (touchdown, arc/drop, empty can, Neers, Hawkins, subscapularis, and cross-body adduction). *Id.* The primary care provider did not offer a specific assessment for the left shoulder pain. *Id.* At the end of the encounter, she recommended ice and heat, placed a referral for physical therapy, prescribed Voltaren (oral tablets of diclofenac sodium, a non-steroidal anti-inflammatory drug ("NSAID")) – without indicating which measures were for Petitioner's right elbow versus left shoulder. *Id.*

---

[5] Petitioner does not allege, nor would the record support, that the vaccination in her left deltoid caused or contributed to her separate right elbow injury.

5

- On November 1, 2018, Petitioner met with a physical therapist for an initial consult regarding both her right elbow and her left shoulder. Ex. 3 at 1-9. Petitioner again reported that the left shoulder pain had been present since the September 25th flu vaccine. *Id.* at 1. She had "waited for a couple of weeks to seek treatment but the [shoulder] pain never improved with exception of slight improvement with steroid."[6] *Id.* at 1-2. The therapist documented the pain location as the posterior lateral left shoulder, a current pain rating of 2/10, and limitations in both active and passive range of motion. He planned one to two PT sessions per week for four to six weeks. *Id.* at 2-9.

- On November 6, 2018, Petitioner completed a second PT session, during which she reported increased left shoulder pain of 4/10. Ex. 3 at 10-12.

- On November 8, 2018, Petitioner presented for an initial consult with an orthopedist at Bellin Health. Ex. 4 at 59-62. He assessed that her right elbow pain represented epicondylitis,[7] for which he administered a cortisone steroid injection and prescribed a wrist splint. *Id.* at 61-62.

- Also on November 8th, the orthopedist recorded Petitioner's history of left shoulder pain onset on September 25th, upon receiving a flu shot which she believed was administered in "the wrong place." Ex. 4 at 59. Petitioner recounted her 2 PT sessions, as well as "heating pad, ice, diclofenac tablets, does provide some relief." *Id.* The orthopedist recorded left shoulder range of motion as "170/60/T10," slightly decreased strength (4/5) in the supraspinatus tendon and upon external rotation, pain, and impingement signs. *Id.* at 61. The orthopedist recommended an MRI to assess whether Petitioner had a "full thickness rotator cuff tear… [which] will not heal on its own." *Id.* at 62. Alternatively, if the MRI supported "a biceps tendinitis, superior labral injury (a/k/a SLAP tear), or rotator cuff tendinitis," they would "consider a course of injections and physical therapy, as well as anti-inflammatory treatment." *Id.*

---

[6] As noted above, Petitioner was only administered the *non-steroidal* drug diclofenac.

[7] External humeral epicondylitis (also known as radio-humeral epicondylitis, bursitis, and popularly, tennis elbow) is defined as an overuse injury of the lateral humeral epicondyle at the elbow, due to inflammation or irritation of the area where the common extensor tendon attaches to it. *Dorland's Illustrated Medical Dictionary*, available at https://www.dorlandsonline.com (hereinafter "*Dorland's*").

- Also on November 8th, the orthopedist noted Petitioner's ongoing prescription for diclofenac oral tablets and added a prescription for diclofenac topical gel, without specifying the right elbow versus the left shoulder. Ex. 4 at 55-56. But as noted above, he had previously recorded that diclofenac had helped to relieve her left shoulder pain. *Id.* at 59.

- On November 21, 2018, Petitioner underwent the recommended left shoulder MRI. Ex. 5 at 42-43. The radiologist perceived "mild, diffuse… SST/IST [supraspinatus and infraspinatus] tendinosis with both bursal and articular surface-sided fraying, but no evidence for full-thickness retracted tear." *Id.* at 42. There was also a grade 2 intramuscular tear pattern. *Id.* at 42-43. The AC joint contained "mild degenerative arthropathy." *Id.* at 43. There was a "possible SLAP tear." *Id.* The subacromial and subdeltoid bursa were "unremarkable." *Id.*

- Later that same day, the orthopedist's physician assistant ("PA") telephoned Petitioner to convey the MRI results. Ex. 4 at 69. The PA recorded: "Plan: follow up in clinic to re-examine. Edema present over the deltoid where her flu shot was done. No evidence of abscess. SLAP tear, biceps tendonitis, RC tendonitis. Appt made for next week per patient's schedule." Ex. 4 at 69.

- At the follow-up appointment on November 28, 2018, the orthopedist documented a region of edema around the fascia in the lateral deltoid, as well as tenderness on palpation at the deltoid and minimally at the biceps tendon. Ex. 4 at 73. However, the orthopedist did not document the presence or absence of any limitations to range of motion or impingement signs. *Id.* While the orthopedist recorded that Petitioner "hasn't had much for changes in the shoulder" and "is here today to discuss MRI results," but he did not restate the specific MRI findings or revisit his earlier suggestions of injections, physical therapy, and anti-inflammatory treatment. *Compare id.* at 62, 74.

- On November 28th, the orthopedist's assessment was limited to: "Left shoulder lateral deltoid pain consistent with region of injection without evidence of abscess or significant intraarticular infection, but some evidence of trauma in the region… I am hopeful that over the course of the next 3-5 months, this improves for her. She is going to come back to see us in a couple of months and will see how things are progressing." Ex. 4 at 73.

- Finally, on November 28th, Petitioner mentioned that her right elbow was "so much better." Ex. 4 at 73.

- On December 26, 2018, the physical therapist recorded that Petitioner had not returned for over a month and therefore, she would be administratively discharged from PT. Ex. 3 at 53-54.

- Petitioner's next medical encounter was on February 8, 2019, with the same orthopedist and was focused on her right elbow. Ex. 4 at 79. He documented that after the November 8th steroid injection, the right elbow was "improved… until mid-January 2019 without any new injury." *Id.* This pain was worse upon gripping and grasping objects and when trying to sleep. *Id.* Wearing the wrist splint provided some relief. *Id.* The orthopedist then recorded: "There are no other concerns at this time." *Id.* After conducting a physical exam limited to the right shoulder, he maintained the assessment of lateral epicondylitis, for which he administered a second cortisone injection. *Id.* at 81. He recommended continued use of the wrist splint and maximization of anti-inflammatory drugs. *Id.* He also prescribed a 90-day supply of the muscle relaxant meloxicam, for the diagnosis of "right elbow pain." *Id.* at 81-82.

- On April 4, 2019, the orthopedist's office approved Petitioner's request for a refill of meloxicam over the telephone, without an appointment. The telephone encounter record does not document Petitioner's current complaints (although the prescription was originally written for the elbow, rather than the shoulder). Ex. 4 at 84-85.

- Petitioner's next medical encounter was on May 29, 2019, when she returned to the same physical therapist. Ex. 3 at 13-18. She reported "continue[d]… L shoulder discomfort especially with overhead movements following the vaccination late last fall… She did end up pursuing an MRI of the L shoulder and reported there was a small tear of the rotator cuff, but the physician recommended it didn't warrant any surgery." *Id.* at 13. Petitioner reported that her shoulder pain was alleviated by "a pain cream," meloxicam, CBD oil, and avoiding certain positions. *Id.* at 13-14. She had stopped the recommended home exercise program at the beginning of 2019 and wanted to give PT "another trial to further help reduce the level of soreness." *Id.* at 13.

8

- On May 29th, the therapist observed Petitioner's discomfort upon active and passive flexion beyond 110 degrees, and abduction beyond 100 degrees. Ex. 3 at 15. The therapist recorded that her pain was causing deficits especially with overhead movements, but it did not warrant immediate referral for additional medical services and could be managed conservatively. He reviewed exercises that she could complete at home. *Id.* at 15-16.

- At the next PT appointment on June 5, 2019, Petitioner reported that since performing the home exercises, she had made some gains in active range of motion. Ex. 3 at 19. The therapist recorded increases in both flexion (114 degrees active and 145 degrees passive) and abduction (110 degrees active and 125 passive). *Id.* He instructed Petitioner to continue with the home exercises. *Id.*

- On June 17, 2019, the orthopedist's office approved Petitioner's request for a refill of diclofenac, without an appointment. Again, the telephone encounter record does not address whether Petitioner was requesting the medication for shoulder versus elbow pain. Ex. 4 at 89.

- At the final PT appointment on August 1, 2019, the therapist documented that Petitioner had further increases in flexion (143 degrees active and 153 passive) and abduction (125 degrees active and 135 passive). Ex. 3 at 21. He approved Petitioner's pan to continue exercises at home and follow up if necessary. *Id.* at 21-22. There are no further records from PT or any other medical encounters pertaining to her left shoulder.

- In an affidavit signed on March 10, 2020, Petitioner recalls thinking that the nurse cleaned an area "a bit too high on [her] shoulder" prior to administering the vaccine. Ex. 6 at ¶ 4. Petitioner recalls "immediat[e]… sharp, intense pain" upon vaccination, which she initially "wait[ed]… out," but "[a]fter a few weeks, [her] pain did not improve and [she] sought medical treatment." *Id.* at ¶¶ 4, 5.

- She recalls, referring to the first two sessions in November 2018, that PT was "extremely painful" and "truly felt like… a waste of time." Ex. 6 at ¶ 6. In late May 2019, she "decided to give [PT] another try." She experienced just as much pain as before, but she was told that PT was necessary to prevent "frozen shoulder." *Id.*

- She does not address the orthopedics consultations. *See generally* Ex. 6.

- She recalls using home exercises, medicated pain cream, and over-the-counter pain medications to manage her pain between appointments. Ex. 6 at ¶ 7.

The above medical records reflect that after the September 25, 2018, flu vaccination, Petitioner experienced fairly mild left shoulder pain and limitations in ROM particularly with overhead movements. Although she first sought medical attention within 30 days, she opted out of PT in favor of pain-protective behavior and anti-inflammatory medications. After a limited return to PT and review of appropriate home exercises, her shoulder was largely rehabilitated eleven months after vaccination.

On November 8, 2018, the orthopedist documented Petitioner's left shoulder reduced range of motion and impingement signs. He recorded that she may have tendinitis or partial tearing, which could be treated with anti-inflammatory treatment, injections, and PT. But after an MRI confirmed those findings, the orthopedist did not document any reassessment of her shoulder function or revisit the potential treatments thereof. That omission creates doubt about the presumed accuracy of the orthopedics records. Regardless, Petitioner notes that on November 8th, the orthopedist *did* document the persistent observable edema, which he projected would self-resolve within three to five months (approximately between five to seven months after vaccination). Petitioner's Motion at 8-9.

More problematic is the February 8, 2019, orthopedics record, which is focused on Petitioner's right elbow and states, "[t]here are no other concerns at this time." But this same record lacks any specific questions pertaining to or physical examination of her left shoulder. *Accord Kirby*, 997 F.3d at 1383 (reasoning that a neurological examination which only ruled out dizziness did not "indicate that Ms. Kirby was asked about or tested negative for any pain, numbness, or tingling related to her vaccine injury"). Moreover in this case, the orthopedist had previously failed to offer any treatment for her left shoulder and projected that the symptoms he did document would resolve on their own. *Accord Kirby* at 1383. (concerning silence in a medical record after Ms. Kirby had "exhausted all available treatment" for the injury alleged and was visiting her doctor for unrelated reasons).

Accordingly, the orthopedics record from this date do not clearly "indicate a resolution of symptoms." Petitioner's Motion at 8. At most, that orthopedics record – and Petitioner's waiver of any follow-up appointments or second opinions for her shoulder,

even while undergoing two steroid injections for her other elbow– point towards a lower potential damages award.

But the February 2019 record at issue is contained within an overall span of treatment evidence that supports Petitioner's severity arguments. That treatment history documents shoulder injury spanning from October 2018 to August 2019 (eleven months after vaccination); consistently reveals the existence of tenderness to palpation, painful and reduced range of motion, and impingement signs; and reflects Petitioner's consistent history of injury since the vaccination and without any other inciting events.[8] Thus, even if I were to give more weight to the February record, *subsequent* records do establish that Petitioner's SIRVA injury had yet to resolve thereafter – and more than six months post-onset.

Respondent also observes that the November 2018 MRI depicts an "unremarkable" subdeltoid bursa, with an underlying pathology (e.g., tearing and tendinosis) that "cannot be explained by vaccination." Response at 9. But the SIRVA QAI does not contemplate injury *solely* to the bursa, but more generally to "the musculoskeletal structures of the shoulder," including the tendons. 42 C.F.R. § 100.3(c)(10). Moreover, upon creating the Table SIRVA injury, the Secretary recognized reliable medical literature which explains:

> In general, chronic shoulder pain with or without reduced shoulder joint function can be caused by a number of common conditions including impingement syndrome, rotator cuff tear, biceps tendonitis, osteoarthritis, and adhesive capsulitis. In many cases, these conditions may cause no symptoms until provoked by trauma or other events…. Therefore, some of the MRI findings… may have been present prior to vaccination *and became symptomatic as a result of vaccination-associated synovial inflammation*.

S. Atanasoff et al., *Shoulder Injury Related to Vaccine Administration (SIRVA)*, 28 Vaccine 8049, 8051 (2021) (emphasis added), quoted in *Lang v. Sec'y of Health & Human Servs.*, No. 17-995V, 2020 WL 7873272, *12 (Fed. Cl. Spec. Mstr. Dec. 11, 2020). Thus in *Lang*, Special Master Horner articulated: "findings consistent with impingement, rotator cuff tears, or AC arthritis do not *per se* preclude a finding that a Table SIRVA exists,"

---

[8] *Compare, e.g.*, *Hartman v. Sec'y of Health & Human Servs.*, No. 19-1106V, 2022 WL 444456, *5 (Fed. Cl. Spec. Mstr. Jan. 14, 2022) (reasoning that the petitioner sustained a SIRVA in October 2018, but she substantially recovered before experiencing pain while moving boxes in June 2020); *Bergstrom v. Sec'y of Health & Human Servs.*, No. 19-784V, 2021 WL 5754968, *7 (Fed. Cl. Spec. Mstr. Nov. 2, 2021) (recognizing that a vaccination aggravated a rotator cuff tear in January 2018 but was not linked to shoulder pain in February 2021).

rather, the question was whether the petitioner's "shoulder pathology wholly explain[ed] her symptoms independent of vaccination." *Id.* at *13.

I have also recognized this proposition that vaccine administration can "provoke" underlying asymptomatic shoulder pathology.[9] (In this sense, while the Table listing suggests the occurrence of a wholly new injury, it could be understood as an aggravation of the underlying pathology – provided, of course, that the petitioner establish all QAI criteria, including the lack of any pre-vaccination "pain, inflammation, or dysfunction of the affected shoulder…" 42 C.F.R. § 100.3(c)(10)(i)).[10] In any event, preexisting *musculoskeletal* pathology is not listed as a specific exclusionary finding for SIRVA. 42 C.F.R. § 100.3(c)(10)(iv) (only separating out "NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy").

Accordingly, I find preponderant evidence establishes that Petitioner suffered residual effects of her injury for more than six months.

Respondent also questions whether there is preponderant evidence of onset within 48 hours, in light of the record from seven days post-vaccination which does not document Petitioner's shoulder pain, even while discussing her exercise routine of walking. Response at 6-7. But the *subsequent* medical records, beginning just twenty-four (24) days after vaccination, support Petitioner's allegations. Those records memorialize that her pain began on the date of vaccination, she waited a couple of weeks to seek treatment, and during that time the pain only increased. Despite the one intervening record from a workplace wellness program, I find that there is preponderant evidence that onset was within 48 hours of vaccination.

## V.   Other Table Requirements and Entitlement

In light of the lack of other objections and my own review of the record, I find that Petitioner has established the other requirements for a Table SIRVA claim. Specifically, the record does not reflect a history of prior left shoulder pathology that would explain Petitioner's post-vaccination injury. 42 C.F.R. § 100.3(c)(3)(10)(i). There is no evidence of any other condition or abnormality that represents an alternative cause. 42 C.F.R. §

---

[9] *See, e.g.*, *Fry v. Sec'y of Health & Human Servs.*, No. 18-1901V, 2020 WL 8457671, n. 8 (Fed. Cl. Spec. Mstr. Dec. 16, 2020) (citing the Atanasoff article); *Hartman v. Sec'y of Health & Human Servs.*, No. 19-1106V, 2021 WL 4823549, n.1 (Fed. Cl. Spec. Mstr. Sept. 14, 2021) (reasoning that the vaccine administration can exacerbate underlying pathology such as a posterior superior labral tear).

[10] I also recognize that if a documented pre-vaccination shoulder injury may foreclose a Table SIRVA claim, the petitioner may still be able to establish causation-in-fact for the same. *See, e.g.*, *Lesher v. Sec'y of Health & Human Servs.*, No. 17-1076V, 2020 WL 4522381 (Fed. Cl. Spec. Mstr. July 2, 2020).

100.3(c)(3)(10)(iii). The pain and reduced range of motion were limited to the shoulder. C.F.R. § 100.3(c)(3)(10)(iv). The contemporaneous vaccine administration record reflects the site of administration as the left deltoid. Ex. 7 at 2, 4; Sections 11(c)(1)(A) and (B)(i). Petitioner has not pursued a civil action or other compensation. Ex. 1 at ¶ 12; Section 11(c)(1)(E). Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## VI. Conclusion and Damages Order

Based on the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation. **Thus, this case is now in the damages phase.**[11]

**By no later than Monday, April 4, 2022, Petitioner shall file a status report updating me on the parties' progress towards informally resolving damages. The status report shall indicate the date by which Petitioner provided, or intends to provide, a demand for damages to Respondent.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[11] The parties are reminded that in Vaccine Act cases, damages issues are typically resolved collaboratively. Therefore, the parties should begin actively discussing the appropriate amount of compensation in this case. In many cases, damages can be resolved by Petitioners communicating a demand to Respondent, who may agree to the demand or may make a counter-offer.

The parties shall not **retain a medical expert, life care planner, or other expert without consulting with each other and the Chief Special Master.** If counsel retains an expert without so consulting in advance, reimbursement of those costs may be affected.